**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MICHAEL PAUL WILLIAMS,           )   No. C 07-5574 MMC (PR)
                                 )
       Plaintiff,                )   **ORDER GRANTING**
                                 )   **DEFENDANTS' MOTION FOR**
   v.                            )   **SUMMARY JUDGMENT**
                                 )
SCOTT KERNAN, et al.,            )   **(Docket No. 84)**
                                 )
       Defendants.               )
_____  )

On November 1, 2007, plaintiff, a California prisoner incarcerated at Pelican Bay State Prison ("PBSP") and proceeding pro se, filed the above-titled civil rights action under 42 U.S.C. § 1983 against various PBSP employees, claiming deliberate indifference to his serious medical needs.[1] Specifically, plaintiff claims defendants improperly treated his chronic right knee injury.

Now before the Court is defendants' motion for summary judgment. Plaintiff has filed opposition and defendants have filed a reply.[2]

---

[1] Plaintiff filed a verified complaint on November 1, 2007 ("Compl.") and an unverified amended complaint on June 23, 2008 ("FAC").

[2] Plaintiff has also filed a response to defendants' reply. (Dkt. No. 102.) Plaintiff did not obtain the Court's permission, as required by Civil Local Rule 7-3(d), to file such response. In any event, the response does not proffer any evidence and refers only to matters already in the record. Accordingly, the response is hereby STRICKEN.

**BACKGROUND**

The following facts are drawn from the parties' evidence submitted in support of and in opposition to the motion for summary judgment, as well as from the exhibits to plaintiff's November 1, 2007 verified complaint. See Akhtar v. Mesa, 698 F.3d 1202, 1209 (9th Cir. 2012) (considering, on Rule 12(b) motion to dismiss claim of deliberate indifference, documents attached to pro se state prisoner's original complaint even though amended complaint had been filed). Unless otherwise noted, the facts are either undisputed or read in the light most favorable to plaintiff.

Plaintiff suffers from a chronic knee injury known as chondromalacia. (Decl. M. Sayre Supp. Mot. Summ. J. ("Sayre Decl.") Ex. A at PB 1132-33, 1149-50.) On July 20, 2004, plaintiff was sent to Sutter Coast Hospital in Crescent City, California for arthroscopic knee surgery, with partial meniscectomy, on his right knee. (Compl. Ex. A.) The surgery was performed by Dr. Mark Lau. (Id.) Following the surgery, plaintiff's knee condition improved. (Sayre Decl. Ex. A at PB 1744.) From August 2004 to November 2005, PBSP medical staff treated plaintiff for a variety of medical issues, including back pain, asthma, allergies, Hepatitis C, and pain to his right knee. (Sayre Decl. ¶ 7.) His treatments included pain medication, knee and back braces, ace bandages, a cane, ice, appointments with specialists, surgery referrals, physical therapy, and other advice pertaining to right knee pain. (Id.)

At some point subsequent to the surgery, plaintiff slipped in the shower, twisting his right knee. (Sayre Decl. Ex. A at PB 1744.) An MRI scan showed evidence of re-tearing of the medial meniscus. (Id.) In November 2005, plaintiff underwent a second arthroscopic knee surgery, with partial meniscectomy, on his right knee. (Sayre Decl. Ex. A at PB 1736-37.)[3] The procedure was performed by outside orthopedist Dr. Gregory Duncan. (Id.) Prior

---

[3] Plaintiff claims he needed the second surgery "to correct the botched July 20th, 2004 surgery." (FAC at 7.) Plaintiff provides no evidence, however, to indicate there was a problem with the first surgery. Further, as discussed above, defendants submit evidence showing the first surgery improved plaintiff's knee condition. Finally, plaintiff admits in his opposition that he "did slip in a small shower which re-injured his knee." (Opp'n. at 7.)

2

to the procedure, Dr. Duncan advised plaintiff that, even if plaintiff underwent a second surgery, plaintiff would still suffer knee pain due to "articular cartilage injury, which [would] not respond reliably to arthroscopic treatment." (Id. at PB 1745.)

Following the November 2005 surgery, plaintiff attended multiple follow-up appointments with Dr. Duncan and was treated extensively by PBSP medical staff. (Sayre Decl. ¶ 7, Ex. A at PB 1732-34; Decl. J. Flowers ("Flowers Decl.") Ex. A.) Plaintiff's subsequent complaints and treatment are summarized as follows:

April and May 2006: Between April 2, 2006 and May 24, 2006, plaintiff submitted seven Inmate Request for Interview ("IRI") forms to PBSP medical staff, complaining about right knee pain and other medical issues and requesting an MRI on his right knee. (Compl. Exs. C-H.) PBSP medical staff responded to each request, informing plaintiff he was scheduled for a physical examination in the near future. (Id.) Staff also informed plaintiff he should submit a Health Services Request Form 7362 ("HSRF"), which is the proper form for requesting medical care. (Id.; Flowers Decl. ¶ 11.)

On May 31, 2006, plaintiff submitted an IRI requesting different pain medication. (Compl. Ex. I.) Defendant James Flowers, RN ("Nurse Flowers") responded that there are no automatic renewals for pain medication and that plaintiff would need to submit an HSRF so that defendant Nurse Practitioner Sue Risenhoover ("N.P. Risenhoover") could evaluate the request. (Id.)

June 2006: On June 2, 2006, Nurse Flowers examined plaintiff, informed plaintiff he was scheduled to see his primary care provider soon, and advised plaintiff as to care for his right knee in the interim. (Flowers Decl. ¶ 12; Compl. Ex. J; Sayre Decl. Ex. A at PB 1510.)

On June 14, 2006, plaintiff filed an Inmate Appeal Form 602, complaining of negligent medical care. (Compl. Ex. K.) Plaintiff asked to be given an MRI and to be given his "regular pain meds (indomecithin/parafon forte)." (Id.)

On June 19, 2006, N.P. Risenhoover treated plaintiff.[4] (Sayre Decl. ¶ 16, Ex A at PB

---

[4] N.P. Risenhoover is a primary care provider. (See Compl. Ex. L.)

3

1506, 1508.) Plaintiff requested he be taken off naprosyn, claiming it made him sick, and requested he be given parafon forte or indomecithin instead. (Id.) N.P. Risenhoover explained that parafon forte, a muscle relaxant, was not medically indicated; instead, she prescribed indomethacin. (Id.) N.P. Risenhoover developed a medical treatment plan for plaintiff's knee. (Id.) At plaintiff's requests, N.P. Risenhoover filled out and forwarded plaintiff's MRI request to the Utilization Management Committee/Medical Authorization Review ("UMC/MAR"). (Sayre Decl. Ex. A at PB 1710.)

On June 26, 2006, the UMC/MAR reviewed plaintiff's request for an MRI. (Sayre Decl. ¶ 17.) The UMC/MAR is an oversight committee that acts upon certain requests for medical treatment, such as an MRI. (Id. ¶ 4.) The UMC/MAR may approve an MRI if surgery is being considered. (Id. ¶ 17.) The committee determined an MRI was not medically indicated for plaintiff because he had just undergone knee surgery. (Sayre Decl. ¶ 17, Ex. A PB 1504.) The committee also noted that plaintiff's August 2005 x-rays showed a normal knee and that plaintiff had refused to take new x-rays. (Id.) The committee approved plaintiff for physical therapy and follow-up. (Id.)

On June 29, 2006, Nurse Flowers responded at the informal level to plaintiff's 602 Inmate Appeal, informing plaintiff the UMC/MAR had reviewed his request for an MRI and had instead prescribed physical therapy. (Id.) Nurse Flowers also informed plaintiff he had been receiving indomecithin since June 21, 2006. (Id.)

July 2006: On July 5, 2006, plaintiff submitted an IRI, again requesting an MRI. (Compl. Ex. M.) Although plaintiff had been informed that HSRF was the proper form for requesting medical care, Nurse Flowers responded and informed plaintiff he would soon be scheduled for a follow-up. (Id.)

On July 24, 2006, N.P. Risenhoover treated plaintiff and explained that the UMC/MAR recommended physical therapy for his surgically repaired knee and that there was no medical indication for an MRI. (Sayre Decl. ¶ 20.) N.P. Risenhoover renewed plaintiff's pain medication. (Compl. Ex. O.) Plaintiff again requested an MRI, and N.P. Risenhoover again forwarded the request to the UMC/MAR. (Sayre Decl. ¶ 20, Ex. A at PB

4

1717.)

August 2006: On August 1, 2006, plaintiff submitted an HSRF, complaining of knee pain. That same day, Nurse Flowers responded, evaluated and advised plaintiff, and scheduled an appointment with N.P. Risenhoover. (Compl. Ex. P; Flowers Decl. ¶ 16.) On August 7, 2006, N.P. Risenhoover examined plaintiff and explained the UMC/MAR denial of his MRI request and its referral for physical therapy instead. (Sayre Decl. ¶ 22.) N.P. Risenhoover discussed plaintiff's medications and prescribed amitriptyline and a right knee sleeve. (Id.)[5]

On August 15 or 16, 2006, defendant Michael Sayre, Chief Medical Officer at PBSP ("Dr. Sayre"), issued a decision on plaintiff's 602 Inmate Appeal at the First Level of Review. (Compl. Ex. L at 4-5.) Dr. Sayre reviewed plaintiff's medical file, including the UMC/MAR's evaluation and N.P. Risenhoover's notes, and determined physical therapy and plaintiff's current pain medication were the proper treatment. (Id.; Sayre Decl. ¶ 23.)

September 2006: On September 20, 2006, defendants Joseph Kravitz, Health Project Coordinator ("Kravitz"), and Maureen McLean, Health Care Manager ("McLean"), issued a decision on plaintiff's 602 Inmate Appeal at the Second Level of Review. (Compl. Ex. L at 6-7.) Kravitz and McLean partially granted the appeal to allow physical therapy as recommended by the UMC/MAR, but denied an MRI and denied plaintiff's request for specific medication. (Id.) They noted plaintiff had stated on September 6, 2006 that his current medication was working well. (Id.) They further pointed out that follow-up visits would be scheduled on a regular basis and that physical therapy was scheduled in the near future, and determined plaintiff's treatment at the time was appropriate for his condition. (Id.)

October 2006: On October 1, 2006, plaintiff submitted an HSRF regarding knee pain and requesting an MRI. (Compl. Ex. Q; Flowers Decl. ¶ 18, Ex. A at PB 1490.) Nurse Flowers examined plaintiff the next day and referred him to his primary care provider. (Id.)

---

[5] Plaintiff's knee sleeve appears to have been prescribed or renewed on August 14, 2006, at a subsequent appointment. (See Compl. Ex. L at 7.)

5

On October 11, 2006, plaintiff treated with Nurse Flowers and N.P. Risenhoover. (Flowers Decl. ¶ 19; Compl. Ex. S.) He was advised as to the proper care of his knee. (Id.) Plaintiff stated his knee was better after his second surgery but that he had again twisted it. (Sayre Decl. Ex. A at PB 1482.)

November 2006: On November 6, 2006, plaintiff submitted an HSRF, complaining of knee pain and other medical issues. (Flowers Decl. Ex. A at PB 1475.) Nurse Flowers responded that day and N.P. Risenhoover treated plaintiff that day. (Id.; Sayre Decl. Ex. A at PB 1472-73.) On August 8, 2006, N.P. Risenhoover prescribed pain medication, including acetaminophen, amitriptyline, and ibuprofen. (Id. at PB 1467.)

On November 28, 2006, defendant N. Grannis, Chief of Inmate Appeals ("Grannis"), issued a Director's Level Review response to plaintiff's 602 Inmate Appeal. (Compl. Ex. L at 8-9.) He found plaintiff's treatment plan and medication were appropriately determined by licensed physicians. (Id.)

December 2006: On December 3 and 11, 2006, plaintiff submitted HSRF's, complaining of right knee pain and requesting an MRI. (Flowers Decl. ¶ 21, Ex. A at PB 1466.) On December 4, 2006, Nurse Flowers examined plaintiff and referred him to N.P. Risenhoover. (Id.) On December 11, 2006, N.P. Risenhoover examined plaintiff, advised him as to proper care for his knee, assessed his medical history, and forwarded to the UMC/MAR a request for a referral for plaintiff to see Dr. Duncan and to receive an MRI. (Sayre Decl. Ex. A at PB 1198, 1710-11.)

On December 12, 2006, the UMC/MAR reviewed plaintiff's case and determined an MRI was not medically indicated, noting plaintiff had not had any recent injury or acute trauma to the joint. (Sayre Decl. Ex. A at PB 1459.) On December 29, 2006, N.P. Risenhoover examined plaintiff, explained the UMC/MAR denial, and prescribed medication for various medical issues. (Sayre Decl. Ex. A at PB 1196.)

January 2007: On January 9, 2007, plaintiff submitted an HSRF regarding knee and back pain. (Flowers Decl. Ex. A at PB 1441-42.) On January 22, 2007, N.P. Risenhoover met with plaintiff. (Sayre Decl. Ex. A at PB 1431-32.) She scheduled a follow-up to discuss

6

his physical therapy, ensured his medications were current, and advised plaintiff to avoid strenuous exercise. (Id.) N.P. Risenhoover also submitted a request on behalf of plaintiff for a referral to Dr. Duncan for Epidural Steroid Injections ("ESI") for plaintiff's back pain. (Id. Ex. A at PB 1708.) On January 29, 2007, the UMC/MAR approved referral to Dr. Duncan for ESI. (Id. Ex. A at PB 1427.)

February and March 2007: On February 7, 2007, plaintiff was examined by Dr. Duncan, who recommended an MRI of the right knee in addition to ESI. (Sayre Decl. ¶ 35, Ex. A at PB 1333, 1706-07.) On February 21, 2007, plaintiff submitted an HSRF, requesting an MRI based on Dr. Duncan's recommendation. (Sayre Decl. ¶ 36, Ex. A at PB 1330.) Nurse Flowers responded and scheduled a follow-up visit. (Id.) On March 2, 2007, N.P. Risenhoover examined plaintiff and informed him the MRI request was not approved. (Sayre Decl. ¶ 37, Ex. A at PB 1327, 1329, 1193.) N.P. Risenhoover scheduled plaintiff for follow-up in 30 days. (Id.)

April 2007: On April 10, 2007, plaintiff wrote a letter directly to Dr. Sayre, requesting an MRI. (Compl. Ex. V.) On April 13, 2007, Dr. Sayre responded and instructed plaintiff on the proper method to request medical care. (Id.)

On April 16, 2007, plaintiff submitted an HSRF, complaining about ear pain. (Flowers Decl. ¶ 24, Ex. A at PB 1312-13.) On April 17, 2007, Nurse Flowers and a primary care provider treated plaintiff. (Id.)

On April 24, 2007, plaintiff submitted an HSRF, complaining of knee pain and requesting an MRI. (Flowers Decl. ¶ 25, Ex. A at PB 1304-05.) On April 25, 2007, Nurse Flowers treated plaintiff and scheduled an appointment for him. (Id.)

May 2007: On May 2, 2007, N.P. Risenhoover treated plaintiff. Plaintiff stated he was satisfied with his pain medication but still wanted an MRI. (Sayre Decl. ¶ 41, Ex. A at PB 1189-90, 1295.) N.P. Risenhoover forwarded the request to the UMC/MAR. (Sayre Decl. ¶ 41, Ex. A at PB 1690.) On May 7, 2007, the UMC/MAR discussed plaintiff's complaints and Dr. Duncan's findings. (Sayre Decl. ¶ 42, Ex. A at PB 1293.) The committee notes state "will do MRI only if [plaintiff] is interested in surgery on the knee." (Id.)

7

On May 22, 2007, N.P. Risenhoover again examined plaintiff for knee and back pain. (Sayre Decl. ¶ 43, Ex. A at PB 1286-87.) They discussed the completion of plaintiff's third ESI on May 1, 2007, which plaintiff reported had made him feel better. (Id.) N.P. Risenhoover also discussed with plaintiff the UMC/MAR recommendations of May 7, 2007. (Id.) The notes from the examination describe plaintiff as stating, "I am interested in right knee surgery if I need it on the right knee so I will get the MRI of my knee." (Id.) N.P. Risenhoover forwarded plaintiff's request. (Id.)

On May 30, 2007, Dr. Duncan treated plaintiff, and Dr. Sayre approved a knee brace and ace wrap for the duration of 30 days at Dr. Duncan's recommendation. (Sayre Decl. ¶ 44, Ex. A at PB 1111.)

June 2007: On June 4, 2007, the UMC/MAR met and discussed plaintiff's knee condition. (Sayre Decl. ¶ 45, Ex. A at PB 1280.) The notes from the meeting state that plaintiff's knee was stable as confirmed by a recent orthopedic examination. (Id.) The committee elected to deny an MRI and to continue to monitor plaintiff's gait and lower back pain. (Id.)

On June 14, 2007, N.P. Risenhoover treated plaintiff and discussed with him that a knee sleeve was no longer medically indicated. (Sayre Decl. ¶ 47, Ex. A at PB 1183.)[6] She also discussed with plaintiff the UMC/MAR finding that an MRI was not medically indicated. (Id.) N.P. Risenhoover advised plaintiff to continue home physical therapy and to avoid strenuous exercise. (Id.) She renewed his medications. (Id.)

July 2007 - September 2007: On July 17, 2007, N.P. Risenhoover examined plaintiff. (Sayre Decl. ¶ 48, Ex. A at PB 1179, 1182, 1252, 1255.) Plaintiff stated he had his pain medication. (Id.) N.P. Risenhoover prescribed ice for plaintiff's lower back pain, and, the same day, Dr. Sayre approved an ice pack. (Id.)

On September 4, 2007, N.P. Risenhoover met with plaintiff and prescribed amitriptyline, tylenol, and ibuprofen for 90 days for plaintiff's knee pain. (Sayre Decl. ¶ 49,

---

[6] No party explains the distinction between a "knee brace" and a "knee sleeve."

1  Ex. A at PB 1177, 1235.)

2  Plaintiff filed this action on November 1, 2007.

## DISCUSSION

A. <u>Legal Standard</u>

Summary judgment is proper where the pleadings, discovery, and affidavits show there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." <u>See</u> Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. <u>See</u> <u>id.</u>

A court shall grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial[,] . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. <u>Id.</u> The burden then shifts to the nonmoving party to "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" <u>See</u> <u>id.</u> at 324 (citing Fed. R. Civ. P. 56(e) (amended 2010)).

For purposes of summary judgment, the court must view the evidence in the light most favorable to the nonmoving party; if the evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the court must assume the truth of the evidence submitted by the nonmoving party. <u>See</u> <u>Leslie v. Grupo ICA</u>, 198 F.3d 1152, 1158 (9th Cir. 1999). The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. <u>See</u> <u>T.W. Elec. Serv., Inc., v. Pacific Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987).

A verified complaint may be used as an opposing affidavit under Rule 56, provided it

9

is based on personal knowledge and sets forth specific facts admissible in evidence. See Schroeder v. McDonald, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated, under penalty of perjury, contents were true and correct, and allegations were not based purely on information and belief but rather on personal knowledge).[7]

B.  Deliberate Indifference to Serious Medical Needs

Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment. See Estelle v. Gamble, 429 U.S. 97, 104 (1976). "A determination of 'deliberate indifference' involves an examination of two elements: the seriousness of the prisoner's medical need and the nature of the defendant's response to that need." McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds, WMX Technologies, Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc). A "serious" medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." Id. (citing Estelle v. Gamble, 429 U.S. at 104). A prison official is deliberately indifferent if he knows a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. Farmer v. Brennan, 511 U.S. 825, 837 (1994). The prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but "must also draw the inference." Id. Consequently, in order for deliberate indifference to be established, there must exist both a purposeful act or failure to act on the part of the defendant and harm resulting therefrom. See McGuckin, 974 F.2d at 1060.

A claim of medical malpractice or negligence is insufficient to make out a violation of the Eighth Amendment. Id. at 1059. Nor does "a difference of opinion between a prisoner-

---

[7] As noted above, plaintiff's FAC is unverified. Plaintiff has, however, submitted a sworn declaration with his opposition.

10

1 patient and prison medical authorities regarding treatment" amount to deliberate indifference.
2 Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981). Consequently, a plaintiff's opinion
3 that medical treatment was unduly delayed does not, without more, state a claim of deliberate
4 indifference. Shapley v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir.
5 1985). Rather, in order to prevail on a claim based on delayed treatment, a plaintiff must
6 show the course of treatment the doctors chose was "medically unacceptable under the
7 circumstances" and that such treatment was chosen "in conscious disregard of an excessive
8 risk to plaintiff's health." See Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996).

C.     Analysis

        1.     Defendants Dr. Sayre, N.P. Risenhoover, and Nurse Flowers

The record amply demonstrates that Dr. Sayre, N.P. Risenhoover, and Nurse Flowers (hereafter "medical staff defendants") provided plaintiff with adequate care. The medical staff defendants, as well as outside physicians, examined plaintiff on multiple occasions and provided him treatment for his chronic knee pain and other health issues. In particular, the record shows that, for the period encompassing plaintiff's complaint, specifically, starting in April 2006 and ending in September 2007, Nurse Flowers responded promptly to each of plaintiff's IRI's and HSRF's, and N.P. Risenhoover treated plaintiff on at least fourteen occasions. During this time, Nurse Flowers and N.P. Risenhoover evaluated plaintiff's condition, created a treatment plan, prescribed medication, prescribed a knee brace and/or sleeve when medically indicated, forwarded plaintiff's requests to the UMC/MAR, explained the committee's findings, instructed plaintiff on proper care for his knee, and referred plaintiff for physical therapy and to specialists. The UMC/MAR also evaluated plaintiff's case on at least five occasions during this period and approved him for physical therapy, ESI injections, and follow-up visits with Dr. Duncan. The undisputed evidence demonstrates the medical staff defendants continuously assessed plaintiff's symptoms and recommended treatment according to his clinical presentation.

Although the allegations and assertions in plaintiff's FAC and opposition are not entirely clear, it appears plaintiff bases his medical indifference claim on the following four

11

arguments: that medical staff defendants (1) denied his requests for an MRI despite Dr. Duncan's recommendation; (2) denied proper pain medication; (3) denied a knee brace; and (4) failed to have him properly examined by a medical doctor. The Court addresses each such argument in turn.

### a. MRI

Plaintiff argues the medical staff defendants were deliberately indifferent to his medical needs because, following plaintiff's second knee surgery, performed in November 2005, Dr. Duncan recommended a further MRI, which recommendation was ignored by PBSP staff. See e.g., Opp'n. at 8 ("On May 2, 2007, [plaintiff] was seen at the time by Dr. Duncan, M.D., for right knee w/ recom for MRI. The MRI rt knee was denied by UMC/MAR.")

Defendants do not dispute that Dr. Duncan recommended an MRI for plaintiff in 2007, nor do defendants dispute that the UMC/MAR denied plaintiff's requests for an MRI. As set forth below, however, Dr. Duncan's recommendation evidences, at most, a difference of opinion as to the type of treatment plaintiff should have received. As noted, a mere "difference of medical opinion . . . [is] insufficient, as a matter of law, to establish deliberate indifference." Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996). .

In particular, defendants have submitted a declaration from Dr. Sayre, a member of the UMC/MAR, setting forth his expert opinion that defendants' actions were medically appropriate and met the standard of care. (Sayre Decl. ¶ 59.) Specifically, in Dr. Sayre's opinion, the only reason to obtain an MRI is in preparation for surgery. (Id. ¶ 57.) According to Dr. Sayre, given plaintiff's two previous surgeries, the chance of any significant improvement with a third surgery, compared to the attendant risks of that surgery, favored a more conservative approach. (Id.) In that regard, Dr. Sayre further states there is a growing body of evidence showing that "removing the meniscus, even in the face of a tear, has no long term benefit" and that "arthroscopic surgery has little benefit." (Id.) Plaintiff has failed to come forward with specific facts to support any findings to the contrary.

Moreover, defendants have submitted evidence showing Dr. Duncan examined plaintiff in June 2008 and noted plaintiff's knee and back pain had improved. (Sayre Decl.

1  Ex. A at PB 1132-33.) Dr. Duncan also noted surgery was not indicated at that time; rather,
2  he recommended exercises. (Id.) In other words, Dr. Duncan's ultimate opinion is aligned
3  with the more conservative approach taken by the medical defendants. Lastly, the record is
4  devoid of any evidence indicating plaintiff's condition was in any manner worsened as a
5  result of his having received physical therapy in lieu of an MRI or a third surgery.

6  In sum, there is no evidence to support a finding that plaintiff's treatment without an
7  MRI was the result of deliberate indifference to his condition.

        b.    Pain Medication

9  Plaintiff argues the medical staff defendants were deliberately indifferent to his
10 medical needs because he told them what medications were effective, and medical staff
11 defendants delayed or denied those medications. See e.g., Opp'n. at 40 ("When plaintiff
12 submitted IRI and HSRF forms, [defendants] took from 7 to 14 days to respond and act upon
13 plaintiff's condition. The defendants repeatedly prescribed ineffective pain medication for 13
14 to 14 months to find the right pain medications even though plaintiff suggested tolerable
15 effective pain medications for his right knee pain.")

16 Contrary to plaintiff's assertions, the undisputed record shows pain medication was
17 regularly provided, including pain medication that plaintiff specifically requested, e.g.,
18 indomecithin and ESI. Indeed, plaintiff reported benefits from many of these treatments.
19 While plaintiff claims he asked for and was denied other pain medications, plaintiff's mere
20 disagreement with the choice of medication is not enough to establish deliberate indifference.
21 See Franklin, 662 F.2d at 1344 (stating "[a] difference of opinion between a prisoner-patient
22 and prison medical authorities regarding treatment does not give rise to a § 1983 claim");
23 Toguchi v. Chung, 391 F.3d 1051, 1058 (9th Cir. 2004) (holding choice of medication alone
24 insufficient to establish deliberate indifference).[8]

25 In sum, there is no evidence showing the medical staff defendants' choice of treatment

---

[8] Further, contrary to plaintiff's assertion that it took one to two weeks for plaintiff to receive a response to his complaints, the undisputed evidence shows medical staff defendants responded to plaintiff's IRI complaints within a few days and responded to plaintiff's HSRF complaints, i.e., the proper form by which a request for medical care is to be made, within a day, and often the same day.

for plaintiff's pain was medically unacceptable under the circumstances, let alone that the medical staff defendants chose such course of treatment in conscious disregard of any risk to plaintiff's health.

                c.      Knee Brace

Plaintiff argues medical staff defendants were deliberately indifferent to his medical needs because they confiscated his knee brace for a period of time. See e.g., Opp'n. at 26 ("Use of a flexible knee brace for exercising is a reasonable recommendation. At the time, defendant Sue Risenhoover, R.N., confiscated the flexible knee brace on June 14, 2007, previously and only returned the flexible knee brace on February 10, 2009, and permanently on September 22, 2010.")[9]

The evidence shows plaintiff was given a knee brace and/or knee sleeve when it was determined by the medical professionals at PBSP to be medically indicated. (Sayre Decl. ¶¶ 22, 44, 47, 48, 54.) Defendants have submitted a declaration from Dr. Sayre, setting forth his expert opinion that "there is little objective evidence to support the use of braces if there is no joint instability" as in plaintiff's case. (Sayre Decl. ¶ 58.) Indeed, Dr. Sayre goes on to state "the use of braces for chondromalacia is contra-indicated. The more a brace, sleeve, or other restriction of the movement of the patella occurs, the worse the movement abnormality becomes." (Id.) Dr. Sayre also reports there are custodial issues associated with knee braces; in particular, because custodial officers are not permitted to tamper with medical devices such as braces, a brace "becomes a great place to move and hide contraband." (Id.) Again, plaintiff fails to come forward with specific facts to support a finding to the contrary, and, as discussed, there is no evidence defendants acted in conscious disregard of an excessive risk to plaintiff's health.

In sum, there is no evidence to support a finding of deliberate indifference based on denial of a knee brace or sleeve.

---

     [9] As noted above, the medical notes from June 14, 2007 state that N.P. Risenhoover was discontinuing a "knee sleeve" not a "knee brace" (Sayre Decl. ¶ 47, Ex. A at PB 1183), and it is unclear whether the parties have used the terms interchangeably.

14

d. Medical Doctor

Plaintiff argues medical staff defendants were deliberately indifferent to his medical needs because the medical care providers who treated him did not include physicians. See e.g., Opp'n. at 25 ("Defendants J. Risenhoover and J. Flowers are registered nurses who do not have physician credentials; medical knowledge; nor orthopedic training.") There is no Eighth Amendment requirement that inmates be treated only by persons holding medical degrees. The evidence shows N.P. Risenhoover is a certified family nurse practitioner, qualifying her to provide primary care to diagnose, treat, and prescribe medication. (See Sayre Decl. ¶¶ 16, 22, 23, 27, 31, 33.) Plaintiff does not identify any appropriate or necessary treatment that he did not receive because N.P. Risenhoover does not have a medical degree, nor does plaintiff provide any evidence suggesting his knee pain was beyond the expertise of a nurse practitioner, and, indeed, the evidence submitted would suggest the contrary.[10]

In sum, there is no evidence to support a finding of deliberate indifference based on the credentials of the medical staff who treated plaintiff.

In conclusion, as to the medical staff defendants, the Court, having considered the evidence in the light most favorable to plaintiff, finds plaintiff has failed to raise a triable issue of material fact as to whether said defendants were deliberately indifferent to plaintiff's serious medical needs.

Accordingly, summary judgment will be granted as to defendants Dr. Sayre, N.P. Risenhoover, and Nurse Flowers.

2. Defendants Grannis, Pimental, McLean, and Kravitz

Defendants argue that defendants Grannis, Pimental, McLean, and Kravitz are entitled to summary judgment because plaintiff cannot establish an Eighth Amendment claim based on the denial of his administrative appeals. The Court agrees. Plaintiff's complaint alleges no

---

[10] Moreover, plaintiff's treatment did include medical doctors. Specifically, plaintiff received numerous referrals to outside orthopedist Dr. Duncan, and plaintiff's treatment was evaluated by the UMC/MAR, of which Dr. Sayre is a member, at least five times. (Sayre Decl. ¶ 56.)

wrongdoing by these defendants directly related to the medical care he received. Rather, said defendants are named in the complaint solely because they reviewed and denied, or partially denied, plaintiff's inmate appeals. (See FAC at 15-16, 20.) There is no constitutional right, however, to a prison administrative appeal or grievance system. Mann v. Adams, 855 F.2d 639, 640 (9th Cir. 1988). Consequently, an incorrect decision on an administrative appeal or a failure to handle it in a particular way does not amount to a violation of plaintiff's constitutional rights. See id.

Accordingly, summary judgment will be granted as to defendants Grannis, Pimental, McLean, and Kravitz.[11]

**CONCLUSION**

For the foregoing reasons, the Court orders as follows:

1. Defendants' motion for summary judgment is hereby GRANTED.

2. The Clerk shall enter judgment in favor of all defendants and close the file.

This order terminates Docket No. 84.

IT IS SO ORDERED.

DATED: February 12, 2013

_____
MAXINE M. CHESNEY
United States District Judge

---

[11] In light of the above findings, the Court does not address herein defendants' alternative argument that plaintiff failed to exhaust administrative remedies.

16